J-A27014-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :   IN THE SUPERIOR COURT OF
   :            PENNSYLVANIA
   :
         v.        :
   :
   :
PENELOPE VERONIKIS,   :
   :
       Appellant   :   No. 204 EDA 2018

Appeal from the PCRA Order December 15, 2017
In the Court of Common Pleas of Lehigh County Criminal Division at
No(s):  CP-39-CR-0000619-2012

BEFORE:  BOWES, J., STABILE, J., and McLAUGHLIN, J.

MEMORANDUM BY BOWES, J.:       **FILED APRIL 16, 2019**

Penelope Veronikis appeals from the order that denied her petition filed

pursuant to the Post Conviction Relief Act ("PCRA").  We affirm.

The trial court offered the following summary of the facts that underlie

Appellant's convictions.

> In 2006, 88-year-old Queen E. Hersh was living in Emmaus, Lehigh County, Pennsylvania with her 80-year-old sister, Ella H. Crawford.  Ella was [Ms. Hersh]'s caretaker as [Ms. Hersh] suffered from various ailments including diabetes, coronary artery disease, high cholesterol, and early Alzheimer's disease.  At the time, Ella worked at the Emmaus Diner, which was owned and operated by Hristos "Chris" Dimou.  In May of 2006, Ella was diagnosed with Leukemia.  Ella told Dimou that she was concerned about what would happen to [Ms. Hersh], and in response, Dimou promised Ella that he would take care of [Ms. Hersh].  Ella died on June 17, 2006, and Dimou subsequently entrusted his then fiancee, [Appellant], with [Ms. Hersh]'s care.  Barbara Paxos is [Appellant's] daughter.
>
> Two days after Ella's death, June 19, 2006, [Appellant] contacted an attorney, Ewalde Cook, Esquire, and arranged for [Ms. Hersh] to execute a Power of Attorney [("POA")] appointing

[Appellant] as [Ms. Hersh]'s agent. Around this same time, [Ms. Hersh] contacted Attorney John Zettlemoyer regarding her own will and Ella's will, which [Attorney] Zettlemoyer had previously prepared. [Ms. Hersh] was the named executrix of Ella's estate. Attorney Zettlemoyer met with [Ms. Hersh] at her home, and Dimou was present. Dimou told [Attorney] Zettlemoyer that [Appellant] had the wills and that "things were being taken care of." A second meeting occurred with [Ms. Hersh], Zettlemoyer and [Appellant]. According to [Attorney] Zettlemoyer's testimony, [Ms. Hersh] did not speak very much at that meeting and [Attorney] Zettlemoyer "suspected that there was something [t]here that [he] didn't understand, and something may be wrong with what was going on, and that [he] was going to call the Area Agency on Aging." Thereafter, [Appellant] contacted Attorney Gary Brienza to probate Ella's estate. According to Attorney Brienza, in order to pay estate taxes and other debts, [Ms. Hersh] decided to sell her and Ella's vacation home located at Lake in the Clouds, Canadensis, Pike County, Pennsylvania.

Attorney Zettlemoyer subsequently contacted the Lehigh County Area Agency for the Aging to report possible elder exploitation, and a care manager was assigned to the case. After an investigation, the manager concluded there was no exploitation occurring and the case was closed. Around this same time, [Ms. Hersh] signed documents naming [Appellant] as the beneficiary of her life insurance policy. Ella Crawford was the original beneficiary on the policy.

On October 30, 2006, [Appellant] had an initial consultation with a plastic surgeon, Dr. Edward Guarino, in regard to elective plastic surgery she wished to have done. On November 1, 2006, an agreement of sale was prepared by Attorney Brienza for the Lake in the Clouds property. [Appellant] signed the document as "POA" for [Ms. Hersh]. Settlement on the property occurred on December 4, 2006, and [Ms. Hersh] was not present. [Appellant] received two checks in the amount of $49,000.00 and $86,000.00 from the sale. Additionally, she received $2,000.00 from the buyers for furniture left in the home. [Appellant] deposited $51,000 into a National Penn Bank (NPB) checking account consisting of the $49,000 check and the $2,000 check—and $86,000 into a NPB money market account. These accounts were in Barbara Paxos's name, but [Appellant] had signatory authority on them both. On the very same day, [Appellant] returned to Dr.

Guarino to set up her surgery. Also on December 4, 2006, [Appellant] wrote a $3,000 check to the Emmaus Diner from Ella's estate account. The memo line read "Funeral luncheon." The check appears to be endorsed by Dimou. The check was subsequently returned for insufficient funds, and a second check was issued, which Dimou deposited into his Lafayette Bank Account.

On December 28, 2006, $34,000 was withdrawn from the NPB money market account and subsequently deposited into Dimou's Lafayette checking account. On January 4, 2007, Dimou wrote checks totaling $39,250.00 to Irene Margetis: $750.00 to repay a loan on behalf of Paxos; $4,500.00 for the purchase of a 1966 Cadillac; $25,000.00 to repay a loan on behalf of [Appellant]; and $9,000.00 for a loan he owed to Margetis. In this same timeframe, [Ms. Hersh] executed a second will naming [Appellant] as executrix.

Over the next few months, approximately $41,000 was electronically transferred from the NPB money market account to the NPB checking account. An additional $10,000 was withdrawn and put in an account for Tom's Bagels, which was owned by [Appellant]. The money market account was closed on March 28, 2007, with a final withdrawal of $1,258.68. The closing withdrawal slip appears to be signed by Paxos.

Around the same time, multiple large electronic expenditures were made from the NPB checking account to various companies not associated with [Ms.] Hersh, including American Express, Bank of America, HSBC Card Services, and Brown Daub car dealership. Large payments were made to Lentz Milling, a bakery product distributor, and Ava's, a Mediterranean baking and bread product company. Payments totaling $10,343.00 were made to Sacred Heart Hospital, Dr. Guarino, M.D., and Sacred Heart Anesthesia in relation to [Appellant]'s plastic surgery. Additionally, multiple debit and point of sale purchases occurred at gas stations, department stores, drugstores, and restaurants in and around the Lehigh Valley. Multiple checks "to cash" were issued from the account. Some appear to be signed by [Appellant] and some appear to be signed by Paxos. On July 20, 2007, the NPB Checking account was closed with a final withdrawal of $3.19. The closing withdrawal slip appears to be signed by Paxos. There was evidence presented that Paxos's signature varied from check to check. Notably, the

- 3 -

lead investigator testified that he questioned whether some of the signatures were actually signed by Barbara Paxos.

On September 12, 2007, [Ms. Hersh] executed a limited [POA] giving [Appellant] the right to obtain a $50,000.00 mortgage on [Ms. Hersh]'s home at 627 Greenleaf Street. [Appellant] subsequently obtained a home equity loan and deposited $33,293.73 into [Ms. Hersh]'s Wachovia checking account. Within a week of the deposit, a series of automatic debit payments were made to multiple credit card companies. In addition, [Appellant] wrote three checks out on September 26, 2007, to cash in the amounts of $800.00, $13,000.00 and $2,000.00. In total, approximately $31,000.00 was spent from the account in a two week period of time. On September 27, 2007, an account in [Ms.] Hersh's name was opened at Commerce Bank. The following day, an initial cash deposit of $13,000.00 was made. In just under one month, [Appellant] withdrew $12,900.00 in cash from this account.

In the Fall of 2007, the only deposits made into [Ms. Hersh]'s Wachovia account were monthly Social Security checks. Each month, [Appellant] made cash withdrawals averaging $1,000.00 within days of the Social Security deposits. The account was subsequently closed in August of 2008.

On July 23, 2008, CitiMortgage filed a mortgage foreclosure action against [Ms. Hersh] for her Greenleaf Street property. According to the action, monthly payments since December 1, 2007, went unpaid. With the help of her long-time neighbor, [Ms. Hersh] contacted Attorney Karl L[o]ngenbach who, at [Ms. Hersh]'s request, prepared a revocation of [Appellant]'s Power of Attorney and requested [Ms. Hersh]'s will be released from Attorney Brienza. Attorney L[o]ngenbach was also provided with information that certain credit cards in [Ms. Hersh]'s name were over the limit and unpaid. After meetings with [Ms. Hersh] and [Appellant], Attorney L[o]ngenbach contacted the Emmaus Police Department and an investigation commenced.

Trial Court Opinion, 6/20/14, at 2-6 (footnotes omitted).

Following a grand jury investigation, Appellant, Dimou, and Paxos were

charged with conspiracy and various theft offenses. The Commonwealth's

- 4 -

theory of the case was that Appellant and her codefendants took advantage of an elderly woman who suffered from dementia, manipulating her into giving Appellant access to her assets and laundering the funds through multiple accounts. Appellant's defense was to acknowledge receipt of the funds, but to claim that Ms. Hersh, who had no remaining family, wanted her to have the money because she viewed Appellant as a daughter. Appellant testified to her close relationship with Ms. Hersh after her sister died, seeing to her physical needs and taking her on recreational excursions. Appellant offered numerous witnesses who testified that Ms. Hersh was not incapacitated, that she was very fond of Appellant, and that Appellant took good care of her.

Nonetheless, in a joint trial with Dimou and Paxos, a jury convicted Appellant of dealing in proceeds of illegal activities, receiving stolen property, theft by deception, theft by failure to make required disposition of funds received, and criminal conspiracy.[1] Appellant was sentenced to thirty-two months to twenty-seven years of imprisonment, and ordered to pay $535,000 in fines and to make restitution to Ms. Hersh's estate. This Court affirmed Appellant's judgment of sentence on January 29, 2016. ***Commonwealth v. Veronikis***, 136 A.3d 1040 (Pa.Super. 2016).

---

[1] Dimou was convicted of dealing in the proceeds of illegal activities, theft by unlawful taking, receiving stolen property, and conspiracy to commit dealing in the proceeds of illegal activities. Paxos was found guilty of receiving stolen property.

- 5 -

Appellant filed a timely, counseled PCRA petition on September 26, 2016. Following several continuances, a hearing was held on January 10, 2017. Transcripts from that hearing were ordered, and, after additional continuances, the hearing was concluded on June 5, 2017. After the parties submitted post-hearing briefs, the PCRA court denied the petition by opinion and order of December 15, 2017.

Appellant filed a timely notice of appeal, and both Appellant and the PCRA court complied with Pa.R.A.P. 1925. Appellant presents the following issues for this Court's consideration:

> Was the Appellant denied effective assistance of prior counsel due to:
>
> I.   The failure to present proper defense reputation witnesses;
>
> II.  The failure to object to hearsay testimony of Karl Longenbach, Esquire, which violated her right of confrontation;
>
> III. The failure to preserve the appellate argument that settlement discussions were inadmissible;
>
> IV.  The failure to object to and preserve claims of prosecutorial misconduct; and
>
> V.   The failure to object and to preserve the claims of improper cross-examination of the Appellant during her allocution and to an excessive maximum sentence imposed without a statement of reasons.

Appellant's brief at 3.

We begin with the principles pertinent to our review. "Our standard of review for issues arising from the denial of PCRA relief is well-settled. We

must determine whether the PCRA court's ruling is supported by the record and free of legal error." ***Commonwealth v. Johnson***, 179 A.3d 1153, 1156 (Pa.Super. 2018) (internal quotation marks omitted). Further, "[i]t is an appellant's burden to persuade us that the PCRA court erred and that relief is due." ***Commonwealth v. Miner***, 44 A.3d 684, 688 (Pa.Super. 2012).

Appellant's claims relate to allegations that her trial counsel rendered ineffective assistance. Counsel is presumed to be effective, and a PCRA petitioner bears the burden of proving otherwise. ***Commonwealth v. Becker***, 192 A.3d 106 (Pa.Super. 2018). To do so, the petitioner must plead and prove (1) the legal claim underlying his ineffectiveness claim has arguable merit; (2) counsel's decision to act (or not) lacked a reasonable basis designed to effectuate the petitioner's interests; and (3) prejudice resulted. ***Id***. The failure to establish any prong is fatal to the claim. ***Id***.

In her first claim, Appellant contends that trial counsel was ineffective in failing to present proper character evidence. Evidence of a person's character is generally inadmissible as proof that the person acted consistent with that character on any particular occasion. Pa.R.E. 404(a)(1). However, a criminal defendant may offer evidence of his or her pertinent character trait as substantive evidence that he or she did not commit a charged crime. Pa.R.E. 404(a)(2)(A). "Evidence of good character is substantive and positive evidence, not a mere make weight to be considered in a doubtful case, and is an independent factor which may of itself engender reasonable doubt or

- 7 -

produce a conclusion of innocence." ***Commonwealth v. Goodmond***, 190 A.3d 1197, 1201 (Pa.Super. 2018) (cleaned up). However, "[t]he failure to call character witnesses does not constitute *per se* ineffectiveness." ***Commonwealth v. Treiber***, 121 A.3d 435, 463 (Pa. 2015).

The permissible means of establishing a pertinent character trait are as follows:

**Rule 405. Methods of Proving Character**

**(a) By Reputation.** When evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation. Testimony about the witness's opinion as to the character or character trait of the person is not admissible.

> (1) On cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct probative of the character trait in question.

> (2) In a criminal case, on cross-examination of a character witness, inquiry into allegations of other criminal conduct by the defendant, not resulting in conviction, is not permissible.

Pa.R.E. 405.

Counsel presented two witnesses to offer character evidence at Appellant's trial: Judy Grillo and Spyros Manessis. However, Appellant contends that counsel failed to elicit from Ms. Grillo an indication of what Appellant's reputation was in the community, and that Mr. Manessis was unaware of Appellant's reputation during the relevant time. Appellant's brief at 14. Appellant suggests that the prosecution highlighted the lack of proper character evidence in its closing argument by stating "that the defense

character evidence that they had heard was 'irrelevant.'" ***Id***. at 13. Appellant maintains that counsel had no reasonable basis for offering defective character evidence when she had informed counsel of numerous other potential character witnesses, including six individuals who testified at the PCRA hearing that they were ready and willing to testify at the trial to Appellant's good reputation. ***Id***. at 15-17. Appellant avers that, "[h]ad the jury been presented with proper, relevant and admissible defense reputation evidence, the outcome of the case may have been different." ***Id***. at 16.

We begin our review of Appellant's claims by examining the character evidence that was offered. The testimony counsel elicited from Ms. Grillo at trial was in its entirety as follows:

Q. Could you tell the ladies and gentleman of the jury your name, please?

A. Judy Grillo.

Q. Where do you live, ma'am?

A. Lancaster, Pennsylvania.

Q. What business or businesses do you follow [*sic*]?

A. I have Auntie Anne's, and I also have a home healthcare business.

Q. Now, when you say, Auntie Anne's, what is that?

A. It's a pretzel shop where we make soft pretzels, hand-rolled pretzels. Hopefully you've all had them.

Q. And do you have one of those, or more than one?

A. I have 13 of them.

Q.    Now, at one of those, you employ [Appellant]?

A.    I do.

Q.    At which one?

A.    It's called the Easton Walmart location, PA 237.

Q.    How long have you employed her?

A.    For two years.

Q.    And during that time have you known other people who know [Appellant]?

A.    I do.

Q.    Have you had a chance to discuss her with them?

A.    I have.

Q.    As a result of those discussions and what you've heard, do you have an opinion as to her reputation for being an honest person?

A.    I do .

MR. SCHEETZ:    Objection, Your Honor.

THE COURT:    Basis?

MR. SCHEETZ:    Your Honor, the opinion or character witness is the opinion of the community, not this individual person's opinion.

THE COURT:    Normally, it is in the general community.

MR. HEITCZMAN:  Yes.

THE COURT:    Just lay a further foundation.

MR. HEITCZMAN:  Okay.

BY MR. HEITCZMAN:

Q.   Now, you've spoken to people in the Easton, Bethlehem area?

A.   I have.

Q.   That's where--you know where [Appellant] lives?

A.   I do.

Q.   And she lives in Bethlehem?

A.   She does.

Q.   So based upon what you've heard from those people, is that what you're basing your opinion on?

A.   Yes.

Q.   Thank you.

     . . . .

     MR. HEITCZMAN: Excuse me. I forgot to ask one, if the Court --

     THE COURT:   Yes. I thought perhaps we were going in that direction.

BY MR. HEITCZMAN:

Q.   What is it that--I asked you if you employed I didn't ask you in what capacity.  I should have.

A.   [Appellant] is my store manager.

Q.   Of the store you mentioned?

A.   Yes. PA 237.

Q.   And what are her responsibilities?

> A.   [Appellant] handles everything for me.  She handles the money; she hires the employees; she opens the store.  She runs the entire operation for me.
>
> Q.   Thank you.

N.T. Trial, 10/16/13, at 5-8.

The other character witness called by trial counsel, Mr. Manessis, testified that he had known Appellant for approximately fifteen years, and that she had a reputation in the community for being a very honest person.  *Id*. at 109-10.  On cross-examination, Mr. Manessis elaborated that he knew her from being a customer at the bagel shop, and from his father being a friend of Appellant's family.  *Id*. at 111-12.  Mr. Manessis confirmed that Appellant had a reputation in the community for being a truthful person, that the community at issue was Mr. Manessis's high school friends who frequented the bagel shop, and that he acquired his information about Appellant's character when in high school.  Mr. Manessis had graduated from high school in 2001.  *Id*. at 115.

At the PCRA hearing, Appellant presented six witnesses who all testified that Appellant had a favorable reputation for being an honest and/or law-abiding person, and that they were able and willing to so testify at Appellant's trial.  *See* N.T. PCRA Hearing, 1/10/17, at 11-28; N.T. PCRA Hearing, 6/5/17, at 4-13.

The PCRA court determined that counsel thoroughly discussed character witnesses with Appellant prior to trial, and had a reasonable basis for deciding

- 12 -

to limit the number to one or two good witnesses who were more credible because they were not related to Appellant. PCRA Court Opinion, 12/15/17, at 3. The PCRA court further found that the deficiencies in testimony presented at trial were harmless. Specifically, although Ms. Grillo did not actually answer the question about Appellant's reputation, "it is clear from her testimony as a whole that she was testifying as to [Appellant's] reputation in the community for being an honest person." *Id*. at 3 n.1. Finally, the PCRA court concluded that the outcome of the trial was unlikely to be different had counsel presented the character evidence developed at the PCRA hearing, as those character witnesses were either biased through being related to Appellant, had otherwise testified as fact witnesses in support of Appellant's defense, or were merely cumulative of the character evidence that counsel did offer at trial. *Id*. at 4.

From a thorough review of the voluminous trial and PCRA hearing transcripts, we conclude that the PCRA court's factual findings are supported by the record, and we see no error or abuse of discretion in its determination that Appellant failed to show a reasonable probability that the outcome would had been different had counsel handled the character witnesses differently.

Appellant's co-defendants presented four or five character witnesses each, and all nine of those testified that one co-defendant or the other had a good reputation for a pertinent character trait. Specifically, Paxos presented

her priest, her godfather, and three family members, while Dimou offered four former employees or customers of his diner.

It was to all defendants' character witnesses as a group that the Commonwealth referred when it commented as follows during closing arguments: "Ladies and gentlemen, you also heard character witnesses, and honestly, character witnesses are going to tell you that the person is a good person because they know them in the community. Quite frankly, the . . . character witnesses are irrelevant." N.T. Trial, 10/17/13, at 208. The prosecutor did not distinguish the quality or quantity of Appellant's witnesses from those of her co-defendants, or contradict the argument of Appellant's counsel that he "presented you with a character witness, her current boss, who lets her run the store all by herself basically, handling money, and that this is a person who is an honest person." *Id*. at 145. Further, Appellant, along with her co-defendants, received the standard character witness jury instruction that evidence of good character may itself raise reasonable doubt and require a verdict of not guilty. *Id*. at 215-16.

Despite the volume of evidence being substantially less against the co-defendants than that offered directly against Appellant, and despite the co-defendants' calling of more character witnesses from whom their attorneys elicited proper reputation testimony, the jury nonetheless found all three of them guilty. The weight of the evidence simply indicated that Appellant took Ms. Hersh's money without her consent, attempting to launder it through

multiple bank accounts, rather than that Ms. Hersh voluntarily went into substantial debt, resulting in foreclosure proceedings being initiated against the home in which she lived and had owned outright, because she was grateful for the care Appellant gave her. *See Veronikis*, 136 A.3d 1040 (unpublished memorandum at 24).

Under the facts of this case, we see no error on the part of the PCRA court in concluding that counsel's choice of character witnesses did not affect the outcome of the trial. *See Commonwealth v. Tharp*, 101 A.3d 736, 760-61 (Pa. 2014) (holding that, although "character evidence alone may be sufficient to raise a reasonable doubt and, thus, justify an acquittal," PCRA relief is not due where "the presentation of character evidence under the facts presented would not have created in the minds of the jury a reasonable doubt"). Therefore, Appellant's first issue merits no relief from this Court.

Appellant next argues that trial counsel was ineffective in failing to object to the hearsay testimony of Attorney Longenbach. By way of background, prior to trial, Appellant filed a motion *in limine* seeking to exclude hearsay statements of Ms. Hersh. Specifically, Appellant sought to prohibit police detective Jason Apgar and Attorney Longenbach's paralegal, Amy Shupp, from testifying that Ms. Hersh told them, *inter alia*, that she did not authorize Appellant to use her money and that she had no knowledge that Appellant took out credit cards and a loan through the POA. Brief in Support of Motion *in Limine*, 12/7/12, at 2-3. The trial court granted the motion,

ordering that the Commonwealth was precluded from introducing the out-of-court statements made by Ms. Hersh to Detective Apgar or Ms. Shupp. Order, 12/11/12. Appellant claims that, despite this ruling, counsel failed to object when Attorney Longenbach

> testified to those same facts, to wit, that Ms. Hersh had told him that she did not know that [Appellant] had secured a home equity loan in her name (which led to the foreclosure notice of her residence), that Ms. Hersh did not know that the Appellant had obtained credit cards in her name[,] and that Ms. Hersh did not know that the Appellant had sold Ms. Hersh's home in the Poconos.

Appellant's brief at 18 (citing N.T. Pretrial Motions, 9/20/13, at 21-22, 44; N.T. Trial 10/10/13, at 49, 54, 56, 71, 73, 78). Appellant contends that counsel should have objected to these declarations of Ms. Hersh as inadmissible hearsay and on the basis that the admission of the statements violated her rights under the Confrontation Clause of the Sixth Amendment. *Id*. at 18-19.

At the PCRA hearing, counsel explained the strategy in handling Attorney Longenbach's testimony as follows.

> A.    I don't like to interpose objections more than I have to. I also don't like to object to something that is going to come out either directly or indirectly some other way, and [Attorney] Longenbach[,] in my view, certainly could have testified as to the meetings he had, surprised look on people's faces, lots of other things, which would make clear what had been said . . . .
>
> Q.    So you thought [Attorney] Longenbach's testimony about what [Ms. Hersh] told him was not objectionable?

> A.  I thought it could have been objected to technically, but there was no good reason to do so because it looked obstructive when the whole context and whole idea of what he was talking about was in evidence and was going to come in in evidence.
>
> Q.  How otherwise would it have come out?
>
> A.  Well, he certainly testified that she asked him to do a new will, that she asked him to tear up her will, and that she asked him to take certain other steps all if which in summary[,] when you put them together, said she didn't know what was going on.

N.T. PCRA Hearing, 1/10/17, at 44-45.  The PCRA court held that this was a reasonable basis for counsel's decision not to object.

In considering Appellant's argument that the PCRA court erred in so holding, we first review the trial testimony of Attorney Longenbach complained of by Appellant.  The portions cited by Appellant in support of her claim are as follows.

> Q.  Did you discuss with [Ms. Hersh] whether or not she wanted to retain you to represent her in trying to unravel what the foreclosure was all about?
>
> A.  Yes.
>
> Q.  And when you informed her what the foreclosure was, what was her reaction?
>
> A.  Shock, astonishment, dismay, fear, absolute—she was incredulous that this document existed.
>
> Q.  As a result of that, did you contact CitiMortgage and find out what generated this foreclosure?
>
> A.  Yes,
>
> . . . .

Q.    Mr. [Attorney] Longenbach, explain to the jury what this document is?

A.    Well, after reviewing the foreclosure complaint and explaining to [Ms.] Hersh that this document was seeking to force the sale of her home, and in the course of my interview, understanding that she had never even known the existence of the mortgage and when she understood that it was [Appellant] who signed this paperwork, it was clear to her that she did not want [Appellant] to continue to have the [POA], because she was shocked and dismayed at what was being presented to her.

      So we prepared the revocation which essentially said that [Ms.] Hersh revoked and made void the appointment of [Appellant] as [her] agent. . . .

      . . . .

Q.    [W]hat further action did you take in August?

A.    Well, as I recall, [a neighbor of Ms. Hersh] was contacting my office as a new matter was coming to his attention, meaning specifically mail was apparently appearing at [Ms.] Hersh's address that hadn't routinely appeared there before, and that included two credit card bills; one, I believe, which Chase, and one, I believe with Citi, if I'm not mistaken.

      So that widened our concern because not only had apparently a home mortgage been signed without the knowledge of [Ms.] Hersh, but apparently credit cards had been taken out in her name as well that she wasn't aware of.

      . . . .

[Q.]  [Referring to letter to Appellant's attorney:] Could we highlight the itemized items in the middle of the letter?

[A.]  Number one was the Capital One credit card. That was one of the credit cards taken out by [Appellant] without the knowledge of [Ms.] Hersh and that was the outstanding amount due at the time, I believe.

. . . .

And number four, . . . There were some settlement costs, but in essence, the [Poconos] property had been sold without [Ms.] Hersh's knowledge-

. . . .

Q.   Now, sir, earlier in your testimony you talked about the fact that there had been contact in September of 2008, with Detective Apgar; is that correct?

A.   Yes.

Q.   Can you relate to the jury what prompted that contact, and what you indicated to the police?

A.   When I learned of the foreclosure complaint, when [the neighbor] began bringing in additional information including credit cards that had been in the name of [Ms.] Hersh, unbeknownst to her, when I learned about the sale of this woman's primary, if not sole, substantial asset in her estate, the vacation property in the Poconos, I believed it was appropriate to contact the police because I thought that this had risen to the level of a potential crime.

N.T. Trial, 10/10/13, at 49, 54.

From our examination of Attorney Longenbach's testimony and counsel's explanation for his failure to object, we conclude that Appellant has failed to prove any prong of the test for ineffective assistance of counsel.

First, hearsay is an out-of-court statement offered for the truth of the matter asserted. *See*, *e.g.*, *Commonwealth v. Manivannan*, 186 A.3d 472, 482 (Pa.Super. 2018). A "statement" is "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." Pa.R.E. 801(a). "Communications that are not assertions are not hearsay.

- 19 -

These would include questions, greetings, expressions of gratitude, exclamations, offers, instructions, warnings, etc." Pa.R.E. 801, *Comment*.

Attorney Longenbach did not once repeat an out-of-court-statement made by Ms. Hersh. Attorney Longenbach testified to Ms. Hersh's reaction when he advised her what the foreclosure action was; his understanding that Ms. Hersh had not been aware of the debts that had been incurred in her name; and that, based upon his understanding, he took certain actions, such as revoking Appellant's POA and contacting the police. As such, the prosecution and Attorney Longenbach deftly avoided repeating any hearsay.

> Nor did the testimony violate Appellant's confrontation rights.
>
> In pertinent part, the Confrontation Clause of the Sixth Amendment, made applicable to the States through the Fourteenth Amendment, provides: In all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him. The right to confrontation applies to witnesses against the accused—in other words, those who bear testimony. Testimony, in turn, is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact.

*Commonwealth v. Brown*, 185 A.3d 316, 319 n.3 (Pa. 2018) (cleaned up). A statement is testimonial if its primary purpose "is to establish or prove past events potentially relevant to later criminal prosecution." *Commonwealth v. Yohe*, 79 A.3d 520, 531 (Pa. 2013) (citation and internal quotation marks omitted). Applying this law to the testimony of Attorney Longenbach, we similarly discern no violation of Appellant's right to confront Ms. Hersh, as he offered no declarations or affirmations that Ms. Hersh made primarily to prove

past events. Rather, Ms. Hersh communicated with her attorney in an attempt to ascertain and manage her finances. Accordingly, Appellant has failed to establish that the claim had arguable merit.

Second, to the extent that any of Attorney Longenbach's testimony constituted implied hearsay by suggesting the substance of Ms. Hersh's communications to Attorney Longenbach,[2] the evidence was offered to explain his course of conduct and was admissible for that purpose. *See*, *e.g.*, *Commonwealth v. Weiss*, 81 A.3d 767, 805 (Pa. 2013) (holding police officer's testimony that he received an anonymous tip that the defendant had driven the victim home on the night she disappeared was properly admitted to explain why the officer interviewed the defendant). Further, the testimony that Attorney Longenbach understood Ms. Hersh to have been previously unaware of the debts did not necessarily implicate Appellant as a wrongdoer, especially where the Commonwealth had offered evidence that Ms. Hersh suffered from a memory disorder and senile dementia. *See* N.T. Trial, 10/11/13, at 80. *Cf. Commonwealth v. Thomas*, 578 A.2d 422, 427-28 (Pa.Super. 1990) (ruling implied hearsay testimony was improperly admitted

---

[2] *See*, *e.g.*, *Commonwealth v. Thomas*, 578 A.2d 422, 427-28 (Pa.Super. 1990) (holding testimony that the police arrested the defendant as a result of a conversation with an individual who did not testify at trial constituted hearsay where "the manner in which the evidence was presented focused impermissibly on its oblique narrative aspect, and in fact emphasized the reliability of an out of court identification of a witness who was not presented to testify and to be cross-examined").

where it "considerably enhanced" the Commonwealth's evidence identifying the defendant at the perpetrator).

Moreover, Appellant does not contest the admissibility of evidence of Ms. Hersh's non-verbal, non-assertive reactions to what Attorney Longenbach told her and the fact that Ms. Hersh revoked Appellant's POA after the foreclosure action was served upon her. *See*, *e.g.*, *Commonwealth v. Patosky*, 656 A.2d 499, 506 (Pa.Super. 1995) (holding officer's testimony that victim was nervous and distraught when reporting crime was not hearsay, as it "was not a statement as it was not intended as a communication"). This admissible evidence established the same thing as Attorney Longenbach's testimony about his understanding informed by his conversations with Ms. Hersh: that she did not have prior knowledge of these debts. As such, Appellant was not prejudiced by counsel's failure to object. *Commonwealth v. Spotz*, 896 A.2d 1191, 1247 (Pa. 2006) ("[C]ounsel will not be deemed ineffective for failing to raise a meritless objection.").

Third, in light of both counsel's correct belief that an objection would have been futile due to the admissibility of the evidence and the establishment of Ms. Hersh's lack of knowledge by other means, and Appellant's failure to attempt to demonstrate that a different strategy had a substantially greater potential for success, Appellant has not satisfied the reasonable basis prong of her claim. *See*, *e.g.*, *Commonwealth v. Johnson*, 139 A.3d 1257, 1276 (Pa. 2016) ("[A]t a minimum, to establish the reasonable basis prong, a PCRA

petitioner must prove that an alternative not chosen offered a potential for success substantially greater than the course actually pursued.") (internal quotation marks omitted)).  Accordingly, the PCRA court did not err in determining that Appellant's hearsay-based claim did not warrant PCRA relief.

Appellant next challenges the representation of appellate counsel.  She contends that counsel's performance was deficient because he did not secure review of the trial court's denial of a pretrial motion *in limine* that sought to exclude evidence of settlement negotiations between Appellant and Attorney Longenbach pursuant to Pa.R.E. 408.  Although appellate counsel "fully presented" the issue in Appellant's brief on direct appeal, this Court's memorandum resolving the appeal did not address it.  Appellant claims that counsel rendered ineffective assistance "in failing to make certain that this Court resolved the claim[.]"  Appellant's brief at 25-26.  We find no merit in Appellant's argument.

Rule 408 provides as follows concerning compromise offers and negotiations:

> **(a) Prohibited Uses.**  Evidence of the following is not admissible --on behalf of any party--either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:
>
> > (1) furnishing, promising, or offering--or accepting, promising to accept, or offering to accept--a valuable consideration in compromising or attempting to compromise the claim; and
> >
> > (2) conduct or a statement made during compromise negotiations about the claim.

**(b) Exceptions.** The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Pa.R.E. 408.

This court has held that Rule 408 does not prohibit offers to pay a complainant from being admitted in criminal cases. As we explained,

> In a criminal prosecution, the accused's offer to pay money or otherwise "settle" the prosecution will be received against him, because that mode of stopping or obstructing the prosecution would be an unlawful act, and good policy could not encourage that mode of dealing with a criminal charge; hence such an offer is receivable for whatever inference may be drawn from it; subject, of course, to the accused's explanation.
>
> 4 Wigmore, Evidence § 1061(d)(8)(3d ed.). Thus, an accused's offer to make restitution to the victim is admissible as evidence of the accused's consciousness of guilt. ***Commonwealth v. Melnyczenko***, . . . 358 A.2d 98, 100 ([Pa.Super.] 1976).
>
> . . . The policy behind excluding [evidence of an offer to pay money "to settle the whole case"] in civil cases does not apply in this instance. Criminal defendants, unlike civil litigants, do not have the choice of whether to forego their own prosecution. . . . Thus, appellant's offer cannot be characterized as an attempt to avoid the inconvenience and expense of a lawsuit. Moreover, in criminal cases, the law does not favor out-of-court compromise over prosecution.

***Commonwealth v. Pettinato***, 520 A.2d 437, 438–39 (Pa.Super. 1987). This case law was the basis of the trial court's denial of Appellant's motion *in limine* and admission of the settlement negotiations to evidence Appellant's consciousness of guilt. ***See*** Trial Court Opinion, 6/20/14, at 10.

- 24 -

Appellant's attempts to distinguish the above case are unpersuasive. Appellant points to the fact that criminal prosecution was not pending during the negotiations, which were initiated by Attorney Longenbach, and that there was no indication that she sought to buy a witness's silence. Appellant's brief at 25. This does not negate the fact that the negotiations were not admitted "to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction," but rather to evidence Appellant's consciousness of guilt and effort to stop the criminal prosecution before it started. *See Commonwealth v. Radecki*, 180 A.3d 441, 457 (Pa.Super. 2018) (indicating evidence regarding civil settlement reached before the criminal trial commenced was admissible to show that the defendant sought to keep the complainant quiet); *Melnyczenko*, *supra* at 100 (holding fact that defendant offered to make restitution to burglary victim was properly admitted as consciousness of guilt).

Accordingly, Appellant has not convinced us that her claim of ineffectiveness regarding appellate counsel's failure to seek reconsideration or reargument in this Court prejudiced her. As such, we have no reason to reverse the PCRA court's decision.[3]

---

[3] The PCRA court determined that appellate counsel had a reasonable basis for not seeking reargument because he deemed it not worth pursuing based upon this Court's resolution of the other issues and the tone of the memorandum. PCRA Court Opinion, 12/15/17, at 9-10. However, we may affirm on any basis apparent from the record. *See*, *e.g.*, *Commonwealth v.*

- 25 -

Appellant's penultimate issue is that the PCRA court erred in denying her claim that prior counsel were ineffective in not making or preserving objections to prosecutorial misconduct. Appellant points to the prosecutor's references to: her failure to produce an accounting of her handling of Ms. Hersh's assets, her bringing a criminal defense lawyer with her to a meeting with Attorney Longenbach prior to the filing of the criminal charges, and his description of Appellant's trial testimony as a "fairy tale." Appellant's brief at 26.

The PCRA court determined that counsel had a reasonable basis for not objecting to the prosecutor's reference to Appellant's failure to offer Attorney Longenbach an accounting of her use of the POA; namely, that he did not wish to highlight the fact that Appellant failed to comply with her responsibilities as the holder of a POA. PCRA Court Opinion, 12/15/17, at 4-5 (citing then-applicable 20 Pa.C.S. § 5601).

This finding is supported by the record. *See* N.T. PCRA Hearing, 1/10/17, at 49. Further, the PCRA court's ruling is not legally erroneous or an abuse of discretion. The prosecution did not suggest to the jury that Appellant had any burden of proof at the criminal trial. Rather, it questioned Attorney Longenbach about his unsuccessful attempts to secure an accounting

---

*Wiley*, 966 A.2d 1153, 1157 (Pa.Super. 2009) ("[W]e may affirm the decision of the PCRA court if there is any basis on the record to support the PCRA court's action; this is so even if we rely on a different basis in our decision to affirm.") (cleaned up).

from Appellant in connection with his representation of Ms. Hersh. **Compare** N.T. Trial, 10/10/13, at 60-62; **with Commonwealth v. Wiggins**, 74, 328 A.2d 520, 521 (Pa.Super. 1974) (*en banc*) ("[A] suggestion by the district attorney that a defendant has a burden of presenting a defense is manifestly erroneous."). This Court has declined to find misconduct when a prosecutor's comment about the absence of certain evidence is in response to the evidence an accused chose to produce in his or her defense. **See**, **e.g.**, **Commonwealth v. Thomas**, 54 A.3d 332, 340 (Pa. 2012) (holding trial court did not abuse its discretion in denying murder defendant's challenge to prosecutor's remarks that defendant failed to present medical evidence to corroborate claim of disability where defendant chose to present his girlfriend to testify that he was physically incapable of firing a gun). Appellant elected to take the stand and put forward a defense that she used her POA to care for Ms. Hersh and that Ms. Hersh wanted her to have the money she took. The Commonwealth did not engage in misconduct by noting that Appellant failed to maintain legally-required records to corroborate her claim.

Regarding Appellant's contention that trial counsel should have objected when the prosecutor asked Appellant about bringing a criminal defense attorney along when she met with Attorney Longenbach, the PCRA court found, *inter alia*, that Appellant failed to establish prejudice. The court based its determination upon the fact that "the jury was already aware, through [Appellant's] own testimony, that she was being threatened with criminal

charges." PCRA Court Opinion, 12/15/17, at 5. This finding is also supported by the record. *See* N.T. Trial, 10/17/13, at 55 (Appellant testified that she was threatened with police involvement and arrest as soon as the foreclosure action was served and she was told by Attorney Longenbach's paralegal to stay away from Ms. Hersh). We fail to see how Appellant was prejudiced by the jury's learning that she took a criminal defense attorney to a meeting with an attorney who was threatening her with criminal prosecution.

The PCRA court also noted there was no arguable merit to Appellant's claim that counsel failed to object to the prosecution's characterization of her version of events as a "fairy tale," as counsel did indeed object. PCRA Court Opinion, 12/15/17, at 6. Our review of the record confirms that trial counsel objected when the Commonwealth questioned her about the "fairy tale" that she told to the jury, and that the Commonwealth then withdrew the question. *See* N.T. Trial, 10/17/13, at 68.

To the extent that Appellant is arguing that defense counsel should have sought to have the comment stricken, she offers little authority to support her claim. Rather, she asserts that "[m]any cases have condemned similar prosecutorial misconduct," and offers an unannotated string cite to decisions of federal circuit courts and two Pennsylvania cases, neither of which is at all factually similar to the instant case. *See* Appellant's brief at 28 (citing *Commonwealth v. Culver*, 51 A.3d 866, 876 (Pa.Super. 2012) (finding misconduct where the prosecutor said during closing argument that the

defendant "the most unreliable historian we're ever going to meet," was "probably the most unreliable, unbelievable person that you are ever going to come across," and was a "compulsive or pathological liar"); and ***Commonwealth v. Correa***, 664 A.2d 607, 611 (Pa.Super. 1995) (holding prosecutor engaged in misconduct by misrepresenting facts and referencing matters not in evidence)).  As such, Appellant has failed to meet her burden of convincing us that the PCRA court erred and relief is due.  ***See Miner***, ***supra*** at 688.

Appellant's final issue relates to her sentencing.  She contends that counsel was ineffective in failing to object to the Commonwealth's cross-examination of her while she exercised her right of allocution and in not preserving a claim that her maximum sentence was excessive.  Specifically, Appellant argues that sentencing counsel should have objected when the Commonwealth inquired, during Appellant's allocution, whether Appellant was still pursuing a claim filed on the eve of the criminal trial that she was entitled to Ms. Hersh's estate because Appellant was named the beneficiary of a will of Ms. Hersh that had been improperly destroyed.  ***See*** N.T. Sentencing, 1/9/14, at 19-20.  Additionally, Appellant suggests that appellate counsel rendered deficient representation when, although he raised and briefed an issue concerning the lack of reasons offered by the trial court for the sentence imposed, he failed to secure review of the issue by seeking *en banc*

reargument when the panel neglected to address the contention in its decision. Appellant's brief at 29-31.

Appellant contends that these issues have arguable merit, albeit by relying upon questionable authority, and she contests counsel's basis for failing to take these actions. However, Appellant offers no argument to this Court how she was prejudiced by either failure on the part of counsel. This Court did consider the discretionary aspects of Appellant's sentence on direct appeal, finding that, although she raised a substantial question, there was no basis to disturb the sentence. This Court noted that the trial court was presumed to have considered and weighed all relevant factors through its review of a presentence investigation report, and that no abuse of discretion was apparent. **See Veronikis**, 136 A.3d 1040 (unpublished memorandum at 30-33). With no attempt to demonstrate that the result of the proceeding would have been different had counsel raised an objection and filed for reargument, we cannot conclude that the PCRA court erred in denying Appellant's claims. **See Miner**, **supra** at 688.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/16/19